UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| | ) | |
| v. | ) | Case No. 3:16-CR-081 JD |
| | ) | 3:16-CR-093 JD |
| GREGORY BROWN | ) | |

**OPINION AND ORDER**

Defendant Gregory Brown has pled guilty to Count 1 of the Superseding Indictment in case 3:16-CR-81 for conspiring to distribute over 100 grams of heroin and to Count 1 of the Indictment in case 3:16-CR-93 for committing wire fraud. With respect to the most recent presentence investigation report ("PSR") [DE 388],[1] the defense's objections and arguments concerning its accuracy have evolved over time. *See, e.g.*, [DE 367; DE 389; DE 389-4; DE 413; DE 417; DE 418; DE 421; DE 429]. As a result, the Court held two status conferences [DE 426; DE 428], so as to pin down the actual disputes requiring resolution by the Court. Thereafter, an evidentiary hearing was held [DE 437], during which the parties presented evidence and argument on the outstanding disputes. The following objections to the guideline calculations exist:

1. The defense's objection to the PSR's application of a 4 level enhancement under guideline § 3B1.1(a) for Brown's role as an organizer or leader of criminal activity that involved 5 or more participants;

2. The defense's objection to the PSR's application of a 2 level enhancement under guideline § 3B1.4 for Brown's having "used or attempted to use a person less than eighteen" to "commit the offense";

3. The government's objection to the PSR's not providing a 2 level enhancement for obstruction of justice under guideline § 3C1.1;

---

[1] Citations to docket entries refer to case 3:16-CR-81. Further, the Court notes that the original presentence investigation report [DE 235] was rendered moot after the Court granted Brown's motion to withdraw his first plea agreement [DE 305], and Brown entered into a new plea agreement [DE 316].

4. The defense's objection to the PSR's not providing a 2 level reduction for acceptance of responsibility under guideline § 3E1.1(a); and

5. The defense's objection to the PSR's not providing the additional 1 level reduction for acceptance of responsibility under guideline § 3E1.1(b)—which includes a related argument by defense counsel concerning a question of whether the government's refusal to motion for the third level reduction violates Brown's constitutional rights or constitutes bad faith.

Further, although not impacting the actual guideline calculations, the defense objects to: Brown's being characterized as "the main source of heroin" in the Michigan City area (PSR ¶ 10); Brown's involvement in a drug transaction with Donnie Allison and Eric Smith on April 14, 2016 (PSR ¶ 13, last sentence); Brown's involvement in any drug transactions after his arrest on April 15, 2016 (PSR ¶¶ 15-20); the probation officer's characterization of Brown's statements to police in April and July 2016 (PSR ¶ 21); and the veracity of Allison's statements to police concerning Brown's role in the drug conspiracy (PSR ¶ 22). The Court now resolves the pending disputes, as identified herein.

### A. Organizer or Leader Enhancement

Brown objects to a 4 level enhancement for being an organizer or leader. Section 3B1.1 provides for various enhancements based on the defendant's role in the offense. If the defendant was an organizer or leader in the criminal activity, then the offense level is increased by 2 levels. § 3B1.1(c). However, if the defendant was an organizer or leader "of a criminal activity that involved five or more participants or was otherwise extensive," the offense level is increased by 4 levels. § 3B1.1(a). This same criminal activity might garner only a 3 level increase, if the defendant was only a manager or supervisor, as opposed to an organizer or leader. § 3B1.1(b). In distinguishing a leadership and organizational role from one of mere management or supervision, factors the Court should consider include the exercise of decision making authority, the nature of

participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others. § 3B1.1 n. 4. There can be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy. *Id*.

To qualify for any enhancement under this section, the defendant must have had a supervisory role over at least one other "participant." § 3B1.1 n. 2; *United States v. Cooper*, 767 F.3d 721, 733 (7th Cir. 2014) ("the defendant only has to 'have had some real and direct influence, aimed at furthering the criminal activity' over one of them.") (citation omitted). A "participant" is a person "who is criminally responsible for the commission of the offense, but need not have been convicted" or charged. § 3B1.1 n. 1; *United States v. Haywood*, 777 F.3d 430, 433 (7th Cir. 2015) ("a defendant can be an organizer or leader without knowing every participant"); *United States v. Blaylock*, 413 F.3d 616, 618 (7th Cir. 2005) ("What matters is that he knowingly aided some part of the criminal enterprise.") (citation omitted). For the 4 level enhancement to apply, the criminal activity must involve five or more participants—meaning the defendant and four others—or be otherwise extensive. § 3B1.1(a); *Haywood*, 777 F.3d at 433.

Brown argues that while he was admittedly involved in a drug conspiracy with co-defendant Donnie Allison, he did not conspire to distribute heroin with the individuals identified in the government's drug conspiracy organizational chart (government's exhibit 2); that is, Jalen Wilson, Eric Smith, Terry Byrd, Daniel Mallet, Jimmy Thomas, and Derek Lott. Brown contends that he lacked sufficient knowledge of the drug activities engaged in by these individuals, apart from Allison. Brown asserts that Allison told the group to lie to the police by indicating that Brown was in charge.

3

Consistent with his position, Brown testified at the evidentiary hearing that Allison was the ringleader who got Brown involved in selling heroin in Michigan City in early 2016. Brown initially purchased heroin from Allison, but eventually Brown started making trips to Chicago to retrieve his own heroin. Brown claimed that Allison remained responsible for sending customers to Brown. Relative to Brown's relationship with others in the group and his knowledge of their criminal activity, Brown minimized his role by testifying that: he sold Lott 3-5 grams of heroin every 2-3 days (for about a month), but did not know that Lott was reselling the drugs; he purchased heroin from Byrd only on one occasion; he met Wilson and Smith through Allison, but never engaged in drug transactions with them or knew of their drug activities; and, he never met or knew of Mallet or Thomas until after his arrest. Brown denied having others deal heroin for him, although on cross-examination, he admitted using a drug runner to complete up to 10 drug transactions per day. Moreover, when cross-examined about a particular heroin deal that took place on April 7, 2016, Brown admitted to setting up the heroin deal when the (then unknown) confidential informant ("CI") called, but Brown denied directing Allison to deliver the drugs. Rather, Brown testified that he simply told the CI where to go, knowing that heroin was typically available in that location.

Much of Brown's hearing testimony concerning his role in and knowledge of the nature and extent of the drug conspiracy is contradicted by other evidence in the record,[2] including

---

[2] In applying the sentencing guidelines, the court "may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy." § 6A1.3(a); *United States v. Grigsby*, 692 F.3d 778, 788 (7th Cir. 2012).

Brown's own statements to police on July 25, 2016,[3] the statements of his co-defendants to police,[4] and the testimony of Detective Willie Henderson of the Michigan City Police Department (which was provided during the evidentiary hearing). For instance, a review of Brown's recorded interview with police in July 2016 shows Brown identifying Allison and Byrd as primarily in charge of the group, with Brown distributing for them, and Lott distributing for Brown (after Brown advised Lott that Allison was cheating him out of money). While Brown denied knowing who Lott sold the drugs to, Brown admitted knowing that Lott wasn't personally using the large amounts that he was purchasing from Brown and that Lott had to be selling the heroin. Brown also confessed to personally getting 40 grams of heroin from Allison every couple of days from January through March, and 20 grams of heroin every couple of days in April, until his arrest on the 15th. Moreover, Brown told police that he knew that Thomas and Smith were getting their heroin from Allison too. Brown explained that he either personally delivered the heroin or sent a runner, including Allison and someone named "Allen," to complete roughly 10 heroin transactions per day from January through mid-April.

Detective Henderson's testimony confirmed that during his investigation into the influx of heroin infiltrating the Michigan City area, the police learned that CIs could set up controlled purchases with "Black" (later identified as Gregory Brown), who sometimes used runners known as "HP" (later identified as Byrd) and "D" (later identified as Allison). The investigation then

---

[3] The interview between Brown and Michigan City Police Detective Willie Henderson was recorded. The disk containing that 2.5 hour recording (identified as government's exhibit 4) was admitted into evidence without objection.

[4] The defense does not object to the Court's consideration of the police reports which document those interviews [DE 424-1 (Terry Byrd's interview); DE 424-2 (Donnie Allison's first interview); DE 424-3 (Donnie Allison's second interview); DE 424-4 (Jalen Wilson's interview); DE 424-5 (Eric Smith's interview); DE 424-6 (Gregory Brown's July 25, 2016 interview)].

involved the execution of various undercover purchases (as listed in government's exhibit 1) and the conducting of various interviews [DE 424-1 through DE 424-5]. Detective Henderson's testimony and the reports detailing the interviews reflect significant consistencies with respect to Brown's role in and knowledge of the drug conspiracy's operation. Specifically, Byrd told police that he acquired heroin for resale from Brown, Allison, and Thomas, and that Brown had him (Byrd), Allison, Thomas, and Wilson deliver heroin for him at various times. Wilson also told police that Brown and Allison supplied his heroin for resale, and Wilson even reported a conversation that took place among the three of them concerning the identification of individuals who were "with them" in distributing heroin (at which time, Byrd was named). Allison, Wilson, and Byrd told police that Brown directed them to sell "fronted" heroin to Brown's customers—and Wilson and Byrd reported going to Chicago (either with or for Brown and Allison) to get loads of heroin from Allison's source of supply while using Brown's money to make the purchases. Byrd indicated that on occasion Brown directed Byrd to contact Thomas for more heroin, and Brown even asked Byrd to work as a unit with Thomas and Wilson, which they did. Eric Smith told police that he received his heroin for distribution from Brown, and that he would make drug "runs" for Brown in exchange for cash. Allison similarly admitted to completing drug transactions for Brown in exchange for heroin. Jimmy Thomas told police that he got introduced to Brown from Wilson, and he then regularly purchased heroin from Brown for distribution to approximately 10 customers. After Brown's arrest, the organization continued to run in much the same manner by the group given the use of several common cell phones.

The Court finds that the government has shown by at least a preponderance of the evidence that, despite Brown's testimony to the contrary, Brown did exercise a sufficient degree of control over the drug conspiracy to qualify as an organizer or leader, that he supervised at

least one other participant, and that the criminal activity involved at least five participants. As detailed above, a number of co-conspirators provided consistent accounts of the conspiracy's hierarchy and its ongoing drug trafficking operations, and they admitted various actions taken in response to Brown's directives during the course of the conspiracy. *See United States v. Collins*, 877 F.3d 362, 366 (7th Cir. 2017). While it may be that Allison initially headed up the Michigan City drug ring in late 2015, it is clear that once Brown got involved in early 2016, CIs knew that they could get heroin from Brown and Brown quickly began playing a leading role in the conspiracy. The Court finds credible the fact that Brown supplied the funds needed (for individuals like Allison and Wilson) to obtain heroin from Chicago, that Brown fronted heroin to Allison, Wilson, and Byrd so that they would resell it, that Brown directed runners (like Allison, Smith, and Allen) to complete drug transactions on Brown's behalf in exchange for money or heroin, and that Brown regularly supplied heroin for resale to known dealers (like Thomas, Smith, and Lott).

To the extent Brown argues that he may not have always distributed the drugs himself, that he was not directly involved in every transaction, or that he did not know all of the drug ring's customers, this does not negate his individual leadership role in the drug trafficking operation, § 3B1.1(a), nor mean that the transactions were not reasonably foreseeable to him and in furtherance of his jointly undertaken criminal activity. § 1B1.3(a)(1), (a)(1)(B); *Blaylock*, 413 F.3d at 618. In fact, by February 2016, Wilson described the drug distribution activity as "being on a roll," and confirmed that he, Allison, and Brown collectively discussed Byrd as being "with them" in the heroin business. Once Brown was arrested, his well-organized drug trafficking ring continued to operate, without the need for his direct involvement given that the organization had been well-established by Brown at that point.

For those reasons, the Court finds that Brown was an organizer or leader of criminal activity that involved five or more participants. Thus, the PSR properly included a 4 level enhancement under § 3B1.1(a), and Brown's objection is overruled.

**B. Use of a Juvenile Enhancement**

Brown objects to the PSR's application of a 2 level enhancement under § 3B1.4. Section 3B1.4 of the guidelines requires a 2 level increase in the offense level where the "defendant used or attempted to use a person less than eighteen years of age to commit the offense or assist in avoiding detection of, or apprehension for, the offense." The application notes to the guideline explain that the phrase "used or attempted to use" includes actions like "directing, commanding, encouraging, intimidating, counseling, training, procuring, recruiting, or soliciting." § 3B1.4 n. 1.

With respect to this enhancement, there is little dispute that Derek Lott was under the age of eighteen, as Detective Henderson's testimony confirmed that Lott (as pictured in government's exhibit 3) was either fifteen or sixteen years old during the calendar year of 2016. However, Brown claims that it wasn't until after his arrest that he learned Lott was under eighteen years of age. Brown also asserts (similar to his objection to the aggravating role enhancement) that he did not conspire with Lott to distribute heroin.

Relative to Brown's first contention, Brown testified that he did not know that Lott was a juvenile until he saw Lott in jail segregated from the adult inmates. Additionally, the government has acknowledged that Brown likely didn't know Lott's actual age. Regardless though, the enhancement can still apply because Brown does not need to have knowledge of the juvenile's age for § 3B1.4 to apply. *United States v. Brazinskas*, 458 F.3d 666, 669 (7th Cir. 2006) ("there is no scienter requirement in § 3B1.4").

Relative to Brown's second contention, the defense characterizes Brown and Lott's relationship as one akin to a buy/seller relationship. Brown testified during the evidentiary hearing that while he admittedly sold Lott 3-5 grams of heroin every 2-3 days (for about a month), he did not know that Lott was reselling the drugs. Brown explained that he never told Lott where or how to sell the heroin and that Lott never returned any profit; rather, Lott simply did his "own thing."

However, the greater weight of the evidence in this respect counters Brown's most recent version of events. In July 2016, Brown admitted to police that Lott was directly beneath him in the drug distribution tree, while he placed Allison and Byrd above himself. *See United States v. Ramsey*, 237 F.3d 853, 861 (7th Cir. 2001) (the facts indicate that the minor was in a subservient position to the defendant, making this a case clearly within the meaning of § 3B1.4). Moreover, it appears more likely than not that Lott began getting his heroin from Brown, only after Brown advised Lott that Allison was cheating him out of money. Thus, Brown certainly encouraged and counseled Lott (who was almost 20 years younger than Brown) to begin selling for him, as opposed to letting Lott continue selling heroin for Allison. Brown also admitted to police that the amount of heroin that he regularly provided Lott over the course of a month was more than Lott could personally use, and he knew Lott was distributing the heroin to others. The Court finds that these facts show by a preponderance of the evidence that Brown affirmatively used a minor in committing the offense of conspiring to distribute heroin. *See United States v. Acosta*, 474 F.3d 999, 1003 (7th Cir. 2007); *United States v. Benjamin*, 116 F.3d 1204, 1206 (7th Cir.1997) (finding that the defendant had conspired with a minor and that the minor was thus his partner in crime, which leads to the conclusion that the minor was used by the defendant). Accordingly, the

PSR correctly applied the 2 level enhancement under § 3B1.4, and Brown's objection is overruled.

   C. **Obstruction of Justice Enhancement**

Next, the government argues that Brown should receive a 2 level enhancement for obstruction of justice under § 3C1.1. Consistent with that guideline section, a defendant receives a 2 level enhancement if "(1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct." § 3C1.1. The application notes provide some examples to clarify the scope of this provision. For example, the enhancement applies by the defendant's "committing, suborning, or attempting to suborn perjury, including during the course of a civil proceeding if such perjury pertains to conduct that forms the basis of the offense of conviction"; and, to the defendant's "providing materially false information to a judge or magistrate judge." § 3C1.1 n. 4(B), (F). However, with respect to alleged false testimony or statements by the defendant, the Court should be cognizant that inaccurate testimony or statements sometimes may result from confusion, mistake, or faulty memory and, thus, not all inaccurate testimony or statements necessarily reflect a willful attempt to obstruct justice. *Id.* n. 2. In seeking this enhancement, the government relies on Brown's sworn testimony given at the sentencing hearing, which it contends was contrary to the evidence presented relative to his objections.

A witness testifying under oath commits perjury when he gives false testimony concerning a material matter with the willful intent to provide false testimony (and for the purposes of § 3C1.1, to obstruct justice) rather than as a result of mistake, confusion, or faulty

10

memory. *United States v. Dunnigan*, 507 U.S. 87, 94 (1993); *see also United States v. Chychula*, 757 F.3d 615 (7th Cir. 2014). The Seventh Circuit has stated that "[a] finding that the defendant 'lied' about a material matter can be sufficient in some cases" to support a perjury finding for the obstruction of justice enhancement. *Chychula*, 757 F.3d at 620 (quoting *United States v. Riney*, 742 F.3d 785, 791 (7th Cir. 2014)). To properly support an enhancement for obstruction of justice, the district court must make independent findings as to all of the elements of perjury: falsity, willfulness, and materiality. *United States v. Carrera*, 259 F.3d 818, 831 (7th Cir. 2001). The burden is on the government to prove by a preponderance of the evidence that the defendant's false testimony was willful. *United States v. Shearer*, 479 F.3d 478, 484 (7th Cir. 2007).

Here, Brown testified during the evidentiary hearing that Allison, and not himself, was in charge of the drug activities of those identified in the government's drug conspiracy organizational chart. Brown provided specific details that minimized his knowledge about each of the members and their drug dealing, yet their accounts consistently (and believably) placed Brown at the helm and described his fronting of money for the group's heroin and his fronting of heroin to members for resale. Brown also testified that none of those depicted in the government's chart sold heroin for him and he never conspired to distribute heroin with anyone, but Allison. But again, as previously detailed herein, Brown's claimed minimal role in and lack of knowledge about the group's drug activities is contradicted by Brown's own statements to police, the statements of his co-defendants to police, and the testimony of Detective Henderson. Additionally, with respect to the drug transaction that took place on April 7, 2016, Brown incredibly testified that he didn't direct Allison to complete the transaction with the CI; rather, he

just told the CI where he could likely find heroin being sold. Brown also falsely denied the extent to which he actually used Derek Lott during the commission of the offense.

Thus, the Court finds that while Brown was under oath, he willfully and intentionally lied about the extent of his role in and knowledge of the drug conspiracy, and that this information was material to the Court's sentencing determinations. The repeated nature of Brown's minimizing his role, deflecting the blame for the group's activities onto Allison, and denying his involvement with the others in the drug ring, indicate that he did not so testify out of mistake, confusion, or forgetfulness; rather, this was a concerted attempt to avoid an enhanced sentence. In other words, Brown's sworn testimony during the course of the sentencing hearing constituted willful material misrepresentations as to what his role in this offense was for the purpose of escaping culpability. *See United States v. Grigsby*, 692 F.3d 778, 785–86 (7th Cir. 2012) ("the materiality of [defendant's] false statements is quite obvious. The issue of her role in the offense was sure to come up during sentencing and would determine whether she qualified for an 'organizer or leader' enhancement under § 3B1.1(a), or a 'manager or supervisor' enhancement under § 3B1.1(b) . . . [and] [h]er lie didn't fool anyone, but that doesn't make it immaterial.").

Based on all of this, the Court finds by a preponderance of the evidence that Brown committed perjury when he gave false testimony concerning material matters with the willful intent to provide the false testimony and obstruct justice. Therefore, he is subject to an enhancement under § 3C1.1, and the government's objection to the PSR's non-inclusion of this enhancement is sustained.

### D. Acceptance of Responsibility Reduction

Brown next objects to the fact that the PSR did not include a 3 level reduction for acceptance of responsibility. Under § 3E1.1, a defendant receives a 2 level reduction "[i]f the

defendant clearly demonstrates acceptance of responsibility for his offense." § 3E1.1(a). A defendant can receive a further reduction of 1 level upon a motion by the government if "the defendant qualifies for a decrease under subsection (a), . . . [and] the defendant has assisted authorities in the investigation or prosecution of his own misconduct by timely notifying authorities of his intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the government and the court to allocate their resources efficiently." § 3E1.1(b). Unlike the enhancements discussed above, a defendant bears the burden on this issue, and must "'clearly demonstrate' acceptance of responsibility by a preponderance of the evidence" in order to receive these reductions. *United States v. Cunningham*, 103 F.3d 596, 598 (7th Cir. 1996).

The guidelines note that pleading guilty prior to trial and truthfully admitting the offense conduct, plus truthfully admitting or not falsely denying relevant conduct, "will constitute significant evidence of acceptance of responsibility." § 3E1.1 n. 3. Doing so, however, does not entitle a defendant to a reduction as a matter of right: "Evidence pointing toward acceptance of responsibility may be outweighed by other incompatible acts or statements." *United States v. Sellers*, 595 F.3d 791, 793 (7th Cir. 2010); § 3E1.1 n. 3 (noting that a guilty plea "may be outweighed by conduct of the defendant that is inconsistent with such acceptance of responsibility"). Moreover, "[c]onduct resulting in an enhancement under § 3C1.1 (Obstructing or Impeding the Administration of Justice) ordinarily indicates that the defendant has not accepted responsibility for his criminal conduct." § 3E1.1 n. 4. "The sentencing judge is required to look beyond formalistic expressions of culpability and to determine whether the defendant has manifested an acceptance of personal responsibility for his offenses in a moral sense." *United States v. DeLeon*, 603 F.3d 397, 408 (7th Cir. 2010); *see United States v. Gilbertson*, 435 F.3d

13

790, 799 (7th Cir. 2006) (noting that courts "assess whether a particular defendant is motivated by genuine acceptance of responsibility or by a self-serving desire to minimize his own punishment").

Here, Brown pled guilty to two counts in indictments that were filed in two different cases. At the change of plea hearing, Brown admitted to sufficient facts to establish a factual basis for those offenses, including his admission relative to the amount of heroin that he should be held accountable [DE 316, ¶ 9(b), stating: "From January 2016 to April 2016, I was involved with several individuals, including Donnie Allison, in distributing heroin in the Michigan City area . . . [w]e bought and delivered between 1000 and 3000 grams of heroin to individuals in this time period"). Thus, this factor weighs in his favor. Moreover, Brown was indicted in late 2016, and he pled guilty by early 2017;[5] thus, the timeliness of his plea also weighs in his favor. § 3E1.1 n. 1(H) (considering "the timeliness of the defendant's conduct in manifesting the acceptance of responsibility.").

A number of factors, however, point in the direction opposite of Brown's accepting responsibility. First, Brown didn't voluntarily terminate or withdraw from the criminal conduct or from his drug trafficking associations until he was apprehended by police. § 3E1.1 n. 1(B). Second, Brown not only failed to voluntarily surrender to the authorities after engaging in the criminal conduct, § 3E1.1 n. 1(D), but after police stopped Brown's vehicle on April 15th, Brown identified himself and then sped off. He led police on a vehicular chase through residential streets in the early afternoon until he crashed into a pole. Thereafter, Brown fled on

---

[5] In both cases, Brown was initially one of the first defendants to enter a plea agreement. This plea agreement was ordered withdrawn by the Court because Brown had not been properly advised of his plea consequences [DE 305]. Thereafter, Brown very quickly reentered into another plea agreement [DE 316]. The Court draws no negative inference against Brown on the basis that the plea process had to be repeated.

foot until police were able to apprehend him. Once detained, Brown organized a scheme to fraudulently post his bond using a stolen credit card. This conduct is certainly not suggestive of accepting responsibility. Admittedly, these events took place before Brown pled guilty. But even after pleading guilty, Brown has continued to demonstrate a lack of genuine acceptance by falsely and frivolously contesting relevant conduct relative to his actual role in and knowledge of the drug conspiracy (as previously discussed herein). In so doing, Brown took the additional significant step of perjuring himself and obstructing justice in a purposeful attempt to mislead the Court so as to curtail his sentencing exposure.

Thus, while the Court acknowledges that Brown's timely guilty plea saved the government the burden of proceeding to trial, which is a mitigating factor, the Court cannot find that Brown has clearly demonstrated acceptance of responsibility for his offenses so as to qualify him for a reduction for acceptance of responsibility. And regardless of the propriety of the government's reasons for not moving for the third level reduction for acceptance of responsibility, Brown is not eligible for the additional decrease under subsection (b) because the Court has determined that he does not "qualif[y] for a decrease under subsection (a)."[6] § 3E1.1(b) n. 6; *United States v. Rounsaville*, 243 F. App'x 176, 178 (7th Cir. 2007) ("according to the guidelines, the one-point reduction in § 3E1.1(b) is available only '[i]f the defendant qualifies for a decrease under subsection (a).'").

Accordingly, the Court overrules Brown's objection that he should have been given credit for acceptance of responsibility under § 3E1.1.

---

[6] Thus, the Court need not reach the merits of the defense's argument that the government's refusal to motion for the third level reduction (which wasn't even contemplated in the latter plea agreement [DE 316 at ¶ 9(H)(1)]) somehow violates Brown's constitutional rights or constitutes bad faith.

15

**E. Non-Guideline Related Objections**

Relative to the remaining objections to the PSR, which do not impact the guideline calculations, the Court resolves those objections as follows:

i. While defendant objects to being characterized as "the main source of heroin" in the Michigan City area (PSR ¶ 10), defense counsel acknowledges that he was "a source of heroin." Without evidence concerning other sources of supply in Michigan City, the Court adopts the defense's characterization and modifies paragraph 10 of the PSR in this respect.

ii. Brown denies any involvement in a drug transaction with Donnie Allison and Eric Smith on April 14, 2016 (PSR ¶ 13, last sentence). To support this statement, the government relies on Byrd's admission to police that he had just been fronted heroin by Brown immediately prior to Brown's arrest on April 15th, and the fact that Smith was a drug runner for Byrd. While this transaction certainly could be viewed as one taken during the course of the conspiracy and thus reasonably foreseeable to Brown, in light of the defense's objection, the Court finds that the government's evidence on this point to be insufficient to draw the conclusion that Brown actually had something to do with that particular transaction. Thus, the Court declines to adopt the last sentence of paragraph 13 in the PSR.

iii. Brown denies any involvement in any drug transactions that took place after his arrest on April 15, 2016 (PSR ¶¶ 15-20), and the government concedes that little evidence reveals Brown's continued involvement in the conspiracy after his apprehension. Accordingly, the Court declines to adopt paragraphs 15 through 20 of the PSR.

> iv. The defense objects to the probation officer's characterization of (as well as the veracity of) Brown and Allison's statements to police (PSR ¶¶ 21, 22). Because the reports detailing those police interviews speak for themselves and the Court has already detailed the significance of the reports herein, the Court declines to adopt paragraphs 21 and 22 of the PSR.

**F. Guideline Calculation**

To summarize the above findings:

With respect to Brown's conviction for conspiring to distribute over 100 grams of heroin, his base offense level is 30, § 2D1.1(c)(5). The offense level is then increased by 2 levels for using a juvenile to commit the offense, § 3B1.4; 4 levels for being an organizer or leader of criminal activity that involved five or more participants, § 3B1.1(a); 2 levels for obstruction of justice, § 3C1.1; and 2 levels for recklessly creating a substantial risk of death or serious bodily injury to another in the course of fleeing from a law enforcement officer, § 3C1.2. This results in an adjusted offense level of 40.

With respect to Brown's conviction for wire fraud, his base offense level is 7, § 2B1.1(a)(1). The offense level is then increased by 4 levels for the amount of loss, which was greater than $15,000 but less than $40,000, § 2B1.1(b)(1)(C). This results in an adjusted offense level of 11.

When determining the combined offense level consistent with § 3D1.4, no increase in the greatest offense level of 40 results (given the large disparity between the two adjusted offense levels), and so the total adjusted offense level for both crimes is 40. Brown's 6 criminal history points place him in criminal history category III. Thus, the applicable advisory guideline range is 360 months of imprisonment to life, in Zone D of the sentencing table. Obviously, having

17

determined the proper advisory guideline range, the Court retains discretion to apply the factors outlined in 18 U.S.C. § 3553(a) to choose a proper sentence. The Court will contact counsel in the near future to resume the sentencing hearing of Gregory Brown.

SO ORDERED.

ENTERED: May 2, 2018

/s/ JON E. DEGUILIO
Judge
United States District Court